IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION



| | |
|---|---|
| PHILLIP S. STENGER, not in his individual capacity but as the court appointed receiver for the assets of Charles Richard Homa, and various related entities, | |
| Plaintiff, | CIVIL ACTION NO. 1:03-CV-1292-JEC |
| v. | |
| MARY JO ROGERS (f/k/a Mary Jo Homa), | |
| Defendant. | |

## O R D E R

This case is presently before the Court on defendant's Motion for Summary Judgment [70] AND plaintiff's Motion for Summary Judgment [76]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Summary Judgment [70] should be **DENIED** AND plaintiff's Motion for Summary Judgment [76] should be **GRANTED in part and DENIED in part**.

### BACKGROUND

Defendant Rogers is the ex-wife of Charles Richard Homa ("Homa"). She filed for divorce on November 23, 1999, and the

divorce decree was entered on January 20, 2000.  The divorce decree incorporates a settlement agreement dated December 10, 2001, in which Homa waived his interest in both of the properties at issue in this litigation: the Club Drive property and the Arbor Trace property. After the divorce, Homa pleaded guilty, in a federal court in the Northern District of Illinois, to securities fraud and international money laundering.  That court, in the case of *Securities and Exchange Commission v. Charles Richard Homa, et al.*, No. 99-CV-6895 (the "SEC Action"), appointed plaintiff as the receiver for the assets of Charles Richard Homa and various other defendants and entities, including Sunset Financial Services, LLC, C4T Management, Inc., and their related entities (collectively referred to as the "Receivership Entities").[1]  As receiver, plaintiff is charged with recovering assets for the benefit of the investors defrauded by Homa.  It is in this capacity that plaintiff seeks to reach the assets at issue in this case: the Arbor Trace property and the proceeds from the sale of the Club Drive property.

Plaintiff and defendant have filed cross-motions for summary judgment.  The Court draws the facts from Defendant's Statement of Material Facts ("DSMF") [70], Plaintiff's Response to Defendant's

---

[1]  Homa controlled both Sunset Financial and C4T Management; both entities are named as defendants in the SEC Action and are under the receivership of the receiver (plaintiff).

2

Statement of Material Facts ("Pl.'s Resp.-DSMF") [82], Plaintiff's Statement of Material Facts ("PSMF") [76], AND Defendant's Response to Plaintiff's Statement of Material Facts ("Def.'s Resp.-PSMF") [85].

## I.    FACTUAL BACKGROUND

### A.    Cash 4 Titles: The Ponzi Scheme[2]

Homa was the mastermind of the fraudulent Cash 4 Titles Ponzi Scheme, a scheme in which thousands of investors/lenders ("C4T Investors") were "bilked" of millions of dollars by Homa and various cohorts.  (PSMF at ¶ 3.)  The stated purpose for the amounts raised in the scheme was that the amounts would be loaned to entities, such as Sunset Financial Services, for re-loan to companies, like C4T Management, through which Cash 4 Titles conducted its car title pawn loan business.  (*Id.* at ¶ 4.)

Not all of the amounts fraudulently raised from the C4T Investors were used for this stated purpose.  (*Id.*)  In fact, plaintiff asserts that only small amounts were actually used for

---

[2]  In a Ponzi scheme, newly invested money is used to pay off old investors and "convince them that they are earning profits rather than losing their shirts." *United States v. Orton*, 73 F.3d 331, 332, n.2 (11th Cir. 1996) (internal quotation and citation omitted).  "The scheme takes its name from the notorious swindler, Charles Ponzi, who, starting in 1919, received $9,582,000 within a period of eight months by inducing investors to give him $100 for the promised repayment of $150."  *Id.*  (internal quotation and citation omitted).

AO 72A
(Rev.8/82)

their stated purpose, while the vast majority of such funds were used to pay for personal expenses of Homa and defendant. (*Id.*)   Defendant disputes the characterizations of "small" amount and "vast majority." (Def.'s Resp.-PSMF at ¶ 5.)   Plaintiff maintains, and defendant denies, that of the wrongfully diverted funds, $2,111,078.99 was improperly used for the benefit of defendant, primarily to purchase two homes, which are discussed *infra.* (PSMF at ¶ 7; Def.'s Resp.-PSMF at ¶ 7.)   The funds applied for defendant's benefit came from the C4T Investor Funds, as Cash 4 Titles was Homa's only source of income.   (PSMF at ¶¶ 8, 20.)   At the time these transfers to defendant were made, Homa and the Receivership Entities were insolvent.   (*Id.* at ¶ 19.)

The events relevant to this lawsuit occurred between the years 1997 and 2000.   In order to put the events relating to the Cash 4 Titles happenings in perspective with the events relating to the Homa--Rogers marriage, divorce, and transfers of property, the Court discusses the facts in the order in which they generally occurred.

**B.   1997**

### 1.   Federal and State Authorities Investigate Homa and Cash 4 Titles

Federal and state authorities investigated Cash 4 Titles in 1997.   On February 27, 1997, the SEC sent a Notice of Nonpublic Investigation to Homa and Cash 4 Titles.   (DSMF at ¶ 60.)   The notice

4

was sent to an address on Cheshire Bridge Road, not to the home address of Homa and defendant. (*Id.*) On September 8, 1997, the Georgia Secretary of State sent a subpoena for documents to Homa at a Lenox Road address, not to the home address of Homa and defendant. (*Id.* at ¶ 61.) The only additional information the Court has regarding these two investigations comes from the Complaint, in which plaintiff states that the investigations were closed when Homa agreed to refund investors the money raised. (Compl. [1] at ¶ 17.)

### 2.   The Homa-Rogers Marriage Shows Signs of Strain

According to the defendant, the Homa-Rogers marriage started to show signs of strain in early 1997. (DSMF at ¶ 10.) Homa seemed preoccupied and traveled a good deal of the time. (*Id.* at ¶ 11.) Defendant suspected he was having--and accused him of having--an extramarital affair. (*Id.* at ¶ 12.) Homa admitted he had been romantically involved with a Cash 4 Titles employee, Sabrina Rogers,[3] but said that the relationship was over and that he had fired the employee. (*Id.* at ¶¶ 13, 44.) After the affair with Sabrina Rogers was over, Homa had an affair with Elizabeth Vitullo[4] from mid-1995

---

[3]   Plaintiff has recovered six (6) properties from Sabrina Rogers, five of which have been sold for the benefit of the Estate for net proceeds of approximately $1.8 million, and one of which, appraised at approximately $200,000, was in the sale process at the time of plaintiff's response brief. (Pl.'s Resp.-DSMF at ¶ 44.)

[4]   Homa gave Ms. Vitullo and her family the following gifts, all of which he paid for with funds obtained from Cash 4 Titles: a

5

though 2000.  (*Id.* at ¶ 45.)  Defendant asked Homa for a divorce and to move out of their home; thereafter, the couple decided to attempt reconciliation.  (*Id.* at ¶¶ 14-15.)

Homa's infidelity caused defendant to reevaluate her financial dependance on him.  (*Id.* at ¶ 16.)  Up until that time, Homa controlled the couple's finances.  (*Id.* at ¶ 5.)  Though defendant was employed throughout the marriage as a clerk-stenographer, administrative assistant, office manager, and legal secretary, she contributed all of her wages, as well as family inheritances, to the marital estate through a joint bank account that Homa controlled.  (*Id.* at ¶¶ 4, 6.)  She had no separate bank accounts or credit card accounts.  (*Id.* at ¶ 7.)  The bank statements were sent to Homa's business, not the couple's marital home address.  (*Id.* at ¶ 8.)  Homa

---

$375,000 house for Ms. Vitullo; a house worth approximately $270,000 for Ms. Vitullo's mother; a house worth approximately $100,000 for Ms. Vitullo's grandmother; four cars to Ms. Vitullo, two of which she sold for approximately $80,000.  (DSMF at ¶¶ 46-49.)  Plaintiff has successfully sued Ms. Vitullo, her mother, and her grandmother for recovery of such monies for the benefit of the Estate.  (Pl.'s Resp.-DSMF at ¶¶ 46-48.)  As to the four cars, two were seized by the Department of Justice and the proceeds of such sale were given to plaintiff for distribution to the C4T Investors.  (*Id.* at ¶ 49.)  The proceeds of the sale of the two remaining automobiles had been applied as a down payment toward the purchase of a house in Florida and plaintiff has been able to recover the sale proceeds of such property.  (*Id.*)

Homa also maintained a joint bank account with Ms. Vitullo, with a balance of approximately $216,000, which primarily came from Homa.  (DSMF at ¶ 50.)  This account was promptly frozen as part of the SEC Action, discussed *infra*.  (Pl.'s Resp.-DSMF at ¶ 50.)

was responsible for the preparation and filing of the couple's joint tax returns throughout their marriage. (*Id.* at ¶ 9.) Defendant feared that if the reconciliation were unsuccessful--or if Homa left her for another woman--she would lose her home, as well as the money she had contributed to the marriage through her own employment. (*Id.* at ¶ 17.)

## C.   1998

In early 1998, as part of their attempt at a fresh start in their marriage, Homa and defendant placed a contract on a new home being constructed at 4412 Club Drive in Atlanta, Georgia (the "Club Drive Property"). (*Id.* at ¶ 18; PSMF at ¶ 22.) Defendant states that the total purchase price of this property was approximately $900,000 (DSMF at ¶ 18), while plaintiff maintains that the cost of purchasing and customizing the home to Homa's and defendant's specifications was $1,411,078.99 (PSMF at ¶¶ 21b, 21c, 24). While both Homa and defendant resided in the Club Drive Property, only defendant held title to the property. (*Id.* at ¶ 23.) Defendant testified that she insisted that the Club Drive Property be titled solely in her name, so that she would have some financial security if Homa left her. (Def.'s Dep., attach. as Ex. U to Pl.'s Resp. to Def.'s Mot. for Summ. J. [82], at 49.)

In October 1998, Mills Byce, the builder of the 7,000 square foot Club Drive Property, executed a warranty deed transferring title

AO 72A
(Rev.8/82)

to the property to defendant. (DSMF at ¶ 20; PSMF at ¶ 21a.) Homa paid all costs associated with the purchase, other than the closing costs, which were paid by defendant. (DSMF at ¶ 21.) Homa made these payments beginning in February 1998. (PSMF at ¶ 26.) Plaintiff maintains that the funds came from C4T Investors (*id.* at ¶ 27), while defendant contends that the funds came from the investors and personal bank accounts funded exclusively by Homa (DSMF at ¶ 27). Homa's only source of income, though, was Cash 4 Titles. (PSMF at ¶¶ 8, 20.) Homa never held title to the Club Drive Property. (DSMF at ¶ 22.)

**D.   1999**

### 1.   July 1999: Defendant Asks for a Divorce

By early 1999, Homa was traveling most of the time. (*Id.* at ¶ 23.) Though defendant knew her husband was traveling, she did not know where he was going. (*Id.* at ¶ 24.) Homa was distant and would not answer defendant's questions about what was going on and why he was troubled. (*Id.* at ¶ 25.) Defendant speculated that either Homa's business in Florida was in trouble due to some new legislation or that he was having another extramarital affair and was planning for a divorce. (*Id.* at ¶ 26.) According to defendant, Homa never gave her any indication of any SEC investigations. (*Id.* at ¶ 27.)

By July 1999, defendant asked Homa for a divorce. (PSMF at ¶ 40; Def.'s Resp.-PSMF at ¶ 40.) Defendant retained a divorce lawyer

AO 72A
(Rev.8/82)

to initiate divorce proceedings in Fulton County, Georgia, in August 1999.   (DSMF at ¶ 29.)   Her attorney proposed a settlement and distribution of assets, which Homa, acting *pro se*, did not contest. (*Id.* at ¶ 30.)   Defendant interpreted Homa's acquiescence as confirmation that her suspicions of marital infidelity were well-founded.   (*Id.* at ¶ 31.)

### 2.   August and September 1999: Homa Pays for Another Home for Defendant

In August 1999--the same month the divorce proceedings began--defendant signed a contract to purchase a townhouse located at 1025 Arbor Trace, in Atlanta, Georgia (the "Arbor Trace Property").   (*Id.* at ¶ 33.)   The closing was on September 27, 1999.   (*Id.*)   Homa put up the funds for her to purchase the Arbor Trace Property, though he, and his companies, were insolvent at the time and unable to pay their debts.   (*Id.* at ¶ 32; PSMF at ¶ 36.)

In September 1999, Homa caused $700,000 to be transferred to an account for the benefit of defendant from an account controlled by Homa at Banc Caribe, Ltd., an offshore bank located in the Commonwealth of Dominica, West Indies.   (*Id.* at ¶¶ 28-29.)   Of this $700,000, $79,067.58 was paid to defendant directly by check dated September 27, 1999, and the balance was used to purchase the Arbor Trace Property.   (*Id.* at ¶ 28)   Defendant was shown a letter that stated that the funds for the Arbor Trace Property purchase were

9

being held in an account at Banc Caribe.   (*Id.* at ¶ 33.)   The purchase price of the Arbor Trace Property was approximately $640,000 (DSMF at ¶ 33), though defendant also spent $250,000--from the proceeds of the May 31, 2000 sale of Club Drive Property--renovating the property (Pl.'s Resp.-DSMF at ¶ 33; PSMF at ¶ 21e, 21f).   The Arbor Trace Property was also titled solely in defendant's name. (DSMF at ¶ 34; PSMF at ¶ 31.)   Defendant has resided in this three-story, over 5,000 square foot townhouse since the sale of the Club Drive Property on May 31, 2000.   (DSMF at ¶ 35, PSMF at ¶ 21d.)   Homa has never resided in this townhouse.   (DSMF at ¶ 36.)

### 3.   October 1999: The SEC Files Suit, Homa's Assets are Frozen, and Homa is Indicted

By the fall of 1999, suit by the SEC Action was imminent and Homa was wearing a wire for the Federal Bureau of Investigation in an effort to secure more lenient treatment in his pending criminal proceeding.[5]   (PSMF at ¶ 10.)

On October 15, 1999, the SEC filed the SEC Action against multiple defendants, including Homa, Sunset Financial Services, and C4T Management.   (*Id.* at ¶ 11.)   The SEC Action triggered publicity concerning Homa and Cash 4 Titles.   (*Id.* at ¶ 12.)   Defendant points out that of the articles on which plaintiff relies for this

---

[5] No party has provided the Court with any information regarding when the criminal proceeding began, when the investigation began, or when Homa became aware of the investigation.

10

statement, only one--dated October 16, 2001 which was after the couple's divorce--is from the Atlanta Journal-Constitution. (Def.'s Resp.-PSMF at ¶ 12.)

Also on October 15, 1999, all of Homa's assets were frozen pursuant to the Order Preserving Funds and Other Assets and Identifying Assets (the "Freeze Order"). (PSMF at ¶ 13.) The parties disagree as to whether the Freeze Order reached the Club Drive Property.[6] (Id.; Def.'s Resp.-PSMF at ¶ 13.) On October 18, 1999, all accounts owned by Homa or in which he had a "beneficial interest" were frozen pursuant to the Order to Financial Institutions Freezing Accounts of Defendants (the "Financial Institution Freeze Order"). (PSMF at ¶ 14 (quoting Financial Institution Freeze Order, attach. as Ex. N to Pl.'s Mot. for Summ. J. [76]).)

Homa was charged with and has pled guilty to securities fraud and international money laundering in connection with the Cash 4 Titles Ponzi Scheme. (Id. at ¶ 15.) On September 10, 2002, Homa was ordered to pay restitution of $157 million and sentenced to a prison term which he has now completed serving. (Id.)

Homa and various Cash 4 Titles defendants related to him, including Sunset Financial Services and C4T Management, have been

---

[6] As discussed *supra*, the Club Drive Property was the marital home of Homa and defendant. Though paid for by Homa, the house was titled in defendant's name alone. Upon their divorce, Homa waived all interest in the house.

11

ordered to pay disgorgement of $157,993,830.25, plus over $35 million in prejudgment interest;   these defendants have consent to this disgorgement.   (*Id.* at ¶ 16.)   The debts of Homa and the various receivership entities exceed the value of their assets by approximately $90 million.   (*Id.* at ¶ 18.)

### 4.   **November 1999: Defendant's Instructions to Her Divorce Attorney**

In November 1999, defendant directed her divorce attorney that the proposed divorce agreement provide "Protection" of the Club Drive and Arbor Trace Properties, as well as her Jaguar convertible, "from any legal action taken against my husband, Charles R. Homa." (PSMF at ¶ 37 (quoting November 19, 1999 Facsimile from Defendant to Dalton, attach. as Ex. F to Pl.'s Resp. to Def.'s Mot. for Summ. J. [82][7]); Pl.'s Resp.-DSMF at ¶ 52 (quoting the same).) Defendant also advised her divorce lawyer that her husband's New York attorney was "Ron Russo (Wall Street firm, specializing in SEC, etc. matters)." (PSMF at ¶ 37; Pl.'s Resp.-DSMF at ¶ 51 (each quoting Dalton Facsimile).)   Homa was *pro se* in the divorce proceedings.

### 5.   **December 1999: The Divorce Settlement Agreement**

On December 10, 1999, defendant and Homa memorialized their

---

[7]     The Court cites to the exhibit attached to plaintiff's response to defendant's statement of facts, rather than that attached to plaintiff's motion for summary judgment, as the former is tabbed, and thus easier for the Court's review, and the latter is not.

12

divorce settlement and executed a divorce settlement agreement. (DSMF at ¶ 37.) In that agreement, Homa waived all of his equitable interest in the Club Drive Property and the Arbor Trace Property and warranted that he had not encumbered either. (*Id.*) As part of the divorce settlement, Homa also relinquished any interest in defendant's 1997 Jaguar and waived any right to her bank accounts and retirement plans. (*Id.* at ¶ 38.) In return, defendant gave up her rights to the remainder of Homa's assets, alimony, division of property, dower, curtesy, year's support, intestacy inheritance, discovery, and any further litigation concerning the marriage or divorce. (*Id.* at ¶ 39.)

**E.  2000**

On January 20, 2000, the Fulton County Superior Court entered a divorce decree and made the divorce settlement agreement part of that decree. (*Id.* at ¶ 40.) Defendant maintains that she has had no contact with Homa since September 1999 and has not received any money or property from him since at least then. (*Id.*) According to Homa, though, he and defendant continued contact until shortly after their divorce on January 20, 2000. (Pl.'s Resp.-DSFM at ¶ 41 (citing Def.'s Homa Aff.,[8] included in Rogers' Appendix [78], at ¶¶ 30-31).)

---

[8] Plaintiff and defendant have each submitted an affidavit from Homa. To be clear, the Court will refer to the affidavit submitted by plaintiff as "Pl.'s Homa Aff." and will refer to the affidavit submitted by defendant as "Def.'s Homa Aff."

13

On May 31, 2000, defendant sold the Club Drive Property for approximately $1,975,000.   (DSMF at ¶ 42; PSMF at ¶ 21g.)   She deposited $1,500,000 of the proceeds with a local brokerage firm as her retirement account.   (DSMF at ¶ 43; PSMF at ¶ 21h.)   She used $250,000 of the proceeds to renovate the Arbor Trace Property and deposited another $250,000 in a combination checking/savings account at Wachovia Bank.   (Pl.'s Resp.-DSMF at ¶ 43; PSMF at ¶ 21h.)

## II.   PROCEDURAL HISTORY

Plaintiff, in his capacity as receiver for the assets of Homa, filed this lawsuit on February 14, 2003, in the United States District Court, Northern District of Illinois, Eastern Division. (Compl. [1].)  He alleges that the transfers to defendant--both the Club Drive Property and the Arbor Trace Property--were fraudulent because they were made with the actual intent to hinder, delay, or defraud the Receivership Entities.   (*Id.* at ¶¶ 30-32.)   He also alleges that defendant was unjustly enriched by the transfers.   (*Id.* at ¶¶ 34-42.)   Plaintiff seeks a judgment against defendant in the amount of $2,693,000.   The case was transferred to this Court by order dated April 23, 2002.   (Order [12].)

Now pending before the Court are plaintiff's and defendant's motions for summary judgment.

14

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion.  *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required to negate his opponent's claim, however.  The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  After the movant has carried his burden, the nonmoving party is then required to "go

15

beyond the pleadings" and present competent evidence[9] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is

---

[9]    The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249-50. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II.  THE FRAUDULENT TRANSFER CLAIMS

As a preliminary matter, the Court notes that the parties agree that O.C.G.A. § 18-2-22[10] (repealed 2002) applies, as it was the fraudulent transfers statute in effect when the events in question occurred. (Def.'s Mem. in Supp. of Mot. for Summ J., "Def.'s Mem.," [70] at 12; Pl.'s Mem. in Supp. of Mot. for Summ J., "Pl.'s Mem.," [76] at 3.)  The parties, of course, disagree as to how to apply O.C.G.A. § 18-2-22 (repealed 2002).

---

[10] "The following acts by debtors shall be fraudulent in law against creditors and others and as to them shall be null and void:

(2) Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the debtor, shall be valid; and
(3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance."

O.C.G.A. § 18-2-22(2),(3)(repealed 2002).

17

**A.    O.C.G.A.    § 18-2-22(3) (repealed 2002)**

Section 18-2-22(3) (repealed 2002) provides that voluntary transfers not supported by valuable consideration and made when the debtor was insolvent are null and void.   O.C.G.A. § 18-2-22(3) (repealed 2002).   There is no dispute that Homa was insolvent at the time of the transfers in question. (PSMF at ¶¶ 36; Def.'s Resp.-PSMF at ¶ 36.)   Indeed, a Ponzi scheme is insolvent from day one.   *In re Indep. Clearing House Co.*, 77 B.R. 843, 860 (Bankr. D.C. Utah 1987). The remaining question, then, is whether the transfers to defendant were supported by valuable consideration.

### 1.    The Club Drive Property

In support of her motion for summary judgment, defendant argues that she gave valuable consideration for the Club Drive Property: her consent to resume marital relations with Homa. (Def.'s Mem. at 16-18.)   Plaintiff responds that there is no evidence to support defendant's position that Homa agreed to place the Club Drive Property solely in defendant's name because she agreed to resume marital relations. (Pl.'s Resp. to Def.'s Mot. for Summ. J., "Pl.'s Resp.," [81] at 11-12.)   Rather, defendant's position--until such time as her summary judgment brief was drafted--was that she insisted that the Club Drive Property be titled solely in her name so that she would have the house in the event Homa left her for another woman. (*Id.*; DSMF at ¶ 17; Def.'s Dep., attach. as Ex. U to Pl.'s Resp. to

AO 72A
(Rev.8/82)

Def.'s Mot. for Summ. J. [82], at 49.)   Plaintiff argues that defendant gave no valuable consideration for the Club Drive Property, making the transfer of it to her fraudulent under O.C.G.A. § 18-2-22(3).   (Pl.'s Resp. at 11-17; Pl.'s Mem. at 12-15.)

Even assuming that an agreement to resume marital relations can be consideration, there was no resumption in this case.   While it is undisputed that defendant and Homa had experienced marital problems at the time the Club Drive Property was titled in defendant's name, defendant and Homa still lived together as husband and wife and defendant wanted to remain married to Homa.   (Def.'s Dep., attach. as Ex. U to Pl.'s Resp. [82] at 17, 37-38.) Further, a letter written on her behalf stated that defendant viewed the Club Drive Property as her "marital dream house in which [she and Homa] expected to a live a number of years."   (September 6, 2000 Letter from Cohen to Schuchman, attach. as Ex. G to Pl.'s Resp. to Def.'s Mot. for Summ. J. [82].)

The evidence also does not support defendant's position that the agreement between herself and Homa was that he would title the property in her name in return for her agreeing to resume marital relations.   Rather, both defendant and Homa have stated that the decision to title the Club Drive Property in defendant's name was made as a result of defendant's insecurity about the marriage, given that Homa had confessed to having had an extra-marital affair.

19

AO 72A
(Rev.8/82)

(Def.'s Homa Aff., included in Rogers' Appendix [78], at ¶ 13; Rogers Aff., included in Rogers' Appendix [78], at ¶ 14; Def.'s Dep., attach. as Ex. U to Pl.'s Resp. to Def.'s Mot. for Summ. J. [82], at 49.)  Moreover, in response to being asked "And I think you told me that [the titling of the Club Drive Property solely in your name] was because of concerns and insecurities that you had about the marriage; right?," defendant responded "Absolutely correct."  (Def.'s Dep., attach. at Ex. U to Pl.'s Resp. [82], at 118.)

All of the evidence regarding the titling of the Club Drive Property and defendant's marriage suggests that the Club Drive Property was titled solely in defendant's name because of fears she had about Homa leaving her.  None of the evidence supports defendant's argument that the property was so titled because she agreed to resume marital relations.[11]  The Court therefore concludes that the Club Drive Property was fraudulently conveyed to defendant.[12]

---

[11]    This determination renders unnecessary a determination whether a promise to resume marital relations could be deemed to be adequate consideration for property worth between $900,000 and 1.4 million dollars, particularly when the marriage lasted only eighteen more months after construction began on the Club Drive home.

[12]    The parties' arguments centered on the plain language of the statute.  Indeed, neither party cited any case law interpreting the statute.  The Court did its own research and it appears that the Georgia courts, in interpreting this statute, have ignored the consideration element.  Instead, the Georgia courts have required plaintiffs to show only that the there was a debt, the debtor was insolvent, and the transfer was voluntary.  *Barclay v. First Nat. Bank of Polk County*, 265 Ga. 744, 462 S.E.2d 374, 375 (1995);

20

Accordingly, the Court **DENIES** defendant's motion for summary judgement and **GRANTS** plaintiff's motion for summary judgment as to this claim.

In granting plaintiff's motion for summary judgment as to the Club Drive Property, the Court is not now deciding the amount of money to which plaintiff is entitled. The Court will require further briefing on this issue at the conclusion of the case. To the extent plaintiff seeks to recover any profit defendant made on the sale of the Club Drive Property in addition to the amount originally spent on it, the Court expects plaintiff to be able to cite case law binding on this Court explaining that such a recovery is required, or even permitted, by law.

### 2.    The Arbor Trace Property

In support of her motion for summary judgment, defendant argues that she gave valuable consideration for the Arbor Trace Property: she waived her right to the remainder of Homa's assets, alimony,

---

*Chambers v. Citizens & Southern Nat. Bank*, 242 Ga. 498, 501, 249 S.E.2d 214, 217 (1978); *Cavin v. Brown*, 246 Ga. App. 40, 41, 538 S.E.2d 802, 804 (2000). The Court does not know why the Georgia courts have done so and neither party has attempted to explain this to the Court. Given that the statute is now repealed, the Georgia courts are not likely to be presented with new cases in which they could provide further guidance. In this case, this may be a distinction without a difference, as plaintiff prevails regardless of whether the Court rules based on the plain language of the statute-- the approach taken by the parties--or the approach of the Georgia courts.

division of property, dower, curtesy, year's support, intestacy inheritance, discovery, and any further litigation concerning the marriage or divorce. (Def.'s Mem. at 8.)  This transfer of property in the dissolution of the marriage, according to defendant, was therefore made for valuable consideration. (*Id.* at 18-19 (citing *Tidwell v. Galbreath (In the Matter of Galbreath)*, 207 B.R. 309, 320 (Bankr. M.D. Ga. 1997) ("the settlement of a bona fide family controversy and waiver of future claims for alimony or property division is a valuable consideration under O.C.G.A. § 18-2-22(3)").)

Plaintiff, in support of his motion for summary judgment, argues that the divorce settlement agreement cannot serve as valuable consideration to support this transfer because the transfer occurred before the agreement was entered into by defendant and Homa. (Pl.'s Mem. at 12.)  Plaintiff also argues that the transfer involved the assets of Sunset Financial Services and C4T Management, not Homa, neither of which received any consideration. (*Id.*)  Finally, plaintiff argues that the release of defendant's right to receive alimony and year's support and other forms of divorce support was meaningless, as Homa was insolvent and was pending criminal sentencing, both facts known to defendant. (*Id.*)

Whether the Arbor Trace Property was in fact given to defendant in return for her releasing Homa of all other potential claims relating to their divorce is a disputed question of fact. The

22

parties agree as to the timing:

- •    July 1999: defendant asked for a divorce;
- •    August 1999: defendant hired a divorce attorney to initiate divorce proceedings AND defendant signed the contract to purchase the Arbor Trace Property;
- •    September 1999: Homa caused $700,000 to be transferred from an offshore account he controlled to defendant for the purchase of the Arbor Trace Property AND defendant closed on the Arbor Trace Property closing;
- •    October 15, 1999: Homa's assets were frozen;
- •    December 10, 1999: defendant and Homa sign the divorce settlement agreement; and
- •    January 20, 2000: the Fulton County Superior Court entered the divorce decree.

Given the temporal proximity of these events, the mere fact that the divorce settlement agreement was signed after the transfer is not enough to establish that the transfer was not made in return for defendant's releasing Homa of other divorce-related claims. A finder of fact could conclude that the Arbor Trace Property was given to defendant so that she would not pursue her right to alimony and other property.

Plaintiff also argues that the transfer involved the assets of Sunset Financial Services and C4T Management, not Homa, and neither company received any consideration. The bank account from which the funds were transferred was controlled by Homa. (PSMF at ¶ 28.) Plaintiff has submitted a letter to a realtor verifying that the

account had sufficient funds for the purchase (Gundeck Letter, attach. as Ex. W to Pl.'s Resp. to Def.'s Mot. for Summ. J. [82]), but there is nothing to indicate to whom the funds belonged.   In other words, plaintiff has not proven that the funds belonged, not to Homa, but to Sunset Financial Services and C4T Management.   The Court cannot, on plaintiff's word alone, grant plaintiff's motion for summary judgment.

Finally, plaintiff argues that defendant knew that the release of her right to receive alimony and year's support and other forms of divorce support was meaningless, as Homa was insolvent and was pending criminal sentencing.   What defendant knew at this time is very much disputed among the parties. As discussed in detail, *infra* at 26-28, defendant denies that she had any knowledge of Homa's legal and financial problems.  Also discussed *infra* at 28-29, plaintiff has evidence showing that defendant did know or should have known of Homa's problems.  Because of the fact disputes existing regarding the transfer of the funds for the purchase of the Arbor Trace Property, the Court cannot grant either party's motion for summary judgment as to this property using O.C.G.A. § 18-2-22(3).   As plaintiff also asserts that the transfer was fraudulent under O.C.G.A. § 18-2-22(2), the Court now turns its attention to that part of the statute.

24

**B.    O.C.G.A. § 18-2-22(2) (repealed 2002)[13]**

In order to state a claim under O.C.G.A. § 18-2-22(2) (repealed 2002), a plaintiff must allege that the transferor had the intent of delaying or defrauding creditors *and* the transferee had knowledge of the transferor's intent. *Brown v. Cooper*, 237 Ga. App. 348, 352, 514 S.E.2d 857, 862 (1999). This knowledge requirement can be satisfied "by proof of actual knowledge or by *proof of circumstances sufficient to put grantee on notice*." *Id.* (emphasis added) (citing *Stokes v. McRae*, 247 Ga. 658, 659, 278 S.E.2d 393, 395 (1981)); *see also Dearing v. A.R. III, Inc.*, 266 Ga. 301, 302, 466 S.E.2d 565, 566 (1996) (sufficient that jury could have found that grantee "had reasonable grounds to suspect" grantor's intent); *Hadlock v. Anderson*, 246 Ga. App. 291, 293, 540 S.E.2d 282, 284 (2000). Therefore, actual knowledge is not required in order for a plaintiff to prevail on a § 18-2-22(2) claim; rather, a plaintiff may still prevail if he produces evidence from which a reasonable inference of notice can be drawn.

In her summary judgment brief, defendant argues only as to the second prong, that she did not know, nor did she have reason to know, of any intent to delay or deceive creditors on the part of Homa.

---

[13]    As the Court has granted plaintiff's motion for summary judgment as to the Club Drive Property, its discussion of the applicability of O.C.G.A. § 18-2-22(a) pertains only to the Arbor Trace Property.

AO 72A
(Rev.8/82)

(Def.'s Mem. at 12-16.)  She therefore appears to be conceding, for summary judgment purposes, that plaintiff can establish the first prong.  Plaintiff, in his summary judgment brief, argues both that Homa had the necessary intent and defendant had the necessary knowledge to establish a fraudulent transfer under O.C.G.A. § 18-2-22(2).  (Pl.'s Mem. at 9-11; 16-20.)

Even assuming that plaintiff can establish that Homa acted with the intent to delay or deceive creditors at the time he made the transfer to defendant, a fact dispute exists as to the second prong, thus precluding summary judgment for either party.  Plaintiff has evidence from which a reasonable trier of fact could conclude that defendant had reason to know of Homa's intent.  Such a conclusion, though, is not required by the evidence, for if the trier of fact believes defendant's testimony, it could return a verdict in her favor.

Defendant, in support of her motion for summary judgment, argues that, at the time of the transfer, she did not know, or have reason to know, of Homa's legal and financial troubles, let alone his fraudulent intent.  (Def.'s Mem. at 12-16.)  She maintains that she did not learn of the illegalities of Homa's business until she was subpoenaed by the SEC in October 2002.  (Def.'s Resp.-PSMF at ¶ 35; DSMF at ¶ 51.)  According to defendant, Homa had not discussed his business affairs in any detail with her and she had no knowledge of

26

his accounts or finances. (DSMF at ¶ 52.) She never entertained her husband's business associates in her home and she never joined him on business travel. (*Id.* at ¶¶ 57-58.) Defendant maintains that Homa never gave her any indication of an SEC investigation of himself or Cash 4 Titles. (*Id.* at ¶ 27.)

Defendant was aware--and critical--of the high interest rates Cash 4 Titles charged. (*Id.* at ¶ 53.) She understood that legislation that was being introduced in Florida would substantially reduce the interest rate that could be charged on car title loans, meaning that Cash 4 Titles business in Florida would be in jeopardy if it passed. (*Id.* at ¶ 54.) When she asked Homa what he would do if the Florida legislation passed, he told her he would restructure the business to provide payday loans instead. (*Id.* at ¶ 55.) Defendant maintains that this was the only business problem of which she knew during her marriage to Homa. (*Id.* at ¶ 56.)

If a jury believes defendant's testimony regarding how Homa controlled the marital finances and kept her out of his business affairs, it could conclude that she had no reason to know of Homa's intent. Such a conclusion is also possible if defendant is able to discredit or otherwise call into question some of plaintiff's evidence, including the credibility of his witnesses.

To support his summary judgment motion as to this claim, plaintiff points to several pieces of evidence, including Byce's

27

affidavit regarding his alleged fall of 1999 discussion with defendant, defendant's instructions to her divorce attorney, and the tax relief letter written for defendant by her employer. According to plaintiff, during the fall of 1999, defendant discussed with Mills Byce, the builder of the Club Drive Property, the legal troubles Homa was experiencing, including the SEC lawsuit and associated criminal proceedings. (*Id.* at ¶ 35; Pl.'s Resp. to DSMF at ¶ 51.)

Plaintiff also points to the instructions defendant gave her divorce lawyer about the need to protect the Club Drive and Arbor Trace Properties, as well as her Jaguar, "from any legal action taken against my husband, Charles R. Homa." (PSMF at ¶ 37 (quoting November 19, 1999 Facsimile from Defendant to Dalton, attach. as Ex. F to Pl.'s Resp. to Def.'s Mot. for Summ. J. [82][14]); Pl.'s Resp.-DSMF at ¶ 52 (quoting the same).) Plaintiff next relies on defendant's identifying Homa's New York attorney, "Ron Russo (Wall Street firm, specializing in SEC, etc. matters)" for her divorce attorney, even though Homa was proceeding *pro se* in the divorce action. (PSMF at ¶ 37; Pl.'s Resp.-DSMF at ¶ 51 (each quoting Dalton Facsimile).)

Finally, plaintiff points to a letter written on defendant's behalf. In connection with an attempt to secure certain tax

---

[14]   The Court cites to the exhibit attached to plaintiff's response to defendant's statement of facts, rather than that attached to plaintiff's motion for summary judgment, as the former is tabbed, and thus easier for the Court's review, and the latter is not.

28

advantages for defendant, N. Jerold Cohen, whose secretary defendant had been for over six years, wrote that the Club Drive Property was to be defendant and Homa's "marital dream house in which they expected to a live a number of years" and that by September 1999, defendant was aware of Homa's financial difficulties, including "the looming prospect of her husband being forced into bankruptcy." (PSMF at ¶ 38 (quoting September 6, 2000 Letter from Cohen to Schuchman, attach. as Ex. G to Pl.'s Resp. to Def.'s Mot. for Summ. J. [82][15]); Pl.'s Resp.-DSMF at ¶ 52 (quoting the same).)  The Court concludes that a jury could, after having been presented with this evidence, find that defendant did have reason to know of Homa's fraudulent intent at the time of the transfer.

Because a fact dispute exists as to whether defendant had reason to know of Homa's fraudulent intent, the Court must **DENY** both defendant's and plaintiff's motions for summary judgment [70, 76] as to plaintiff's claim that the Arbor Trace Property was fraudulently conveyed to defendant.

## III. THE UNJUST ENRICHMENT CLAIM

Georgia law allows a plaintiff to recover under the theory of unjust enrichment "when there is no legal contract and when there has

---

[15]   The Court cites to the exhibit attached to plaintiff's response to defendant's statement of facts, rather than that attached to plaintiff's motion for summary judgment, as the former is tabbed, and thus easier for the Court's review, and the latter is not.

been a benefit conferred which would result in an unjust enrichment unless compensated." *Smith Serv. Oil Co., Inc. v. Parker*, 250 Ga. App. 270, 272, 549 S.E.2d 485, 487 (2001) (internal citations omitted).   Plaintiff argues that there is no legal contract here because the divorce settlement agreement was entered into after the transfer[16] occurred and because defendant knowingly accepted the transfer at the expense of the creditors.  (Pl.'s Mem. at 21-22.)

As discussed in detail *supra*, the timing of the transfer and the signing of the divorce settlement does not compel the result advocated by plaintiff.   There are fact disputes regarding what defendant knew of Homa's legal and financial problems at the time of the transfers.   *Supra* at 26-29.   For all the reasons already discussed by the Court, the Court **DENIES** plaintiff's motion as to the unjust enrichment claim.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** defendant's Motion for Summary Judgment [70] AND **GRANTS in part and DENIES in part** plaintiff's Motion for Summary Judgment [76].

---

[16]   Again, as the Court has granted plaintiff's motion as to the Club Drive Property, the only property and transfer now at issue is the Arbor Trace Property.

SO ORDERED, this 22 day of February, 2006.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)